1

2

3

4

5

6                      UNITED STATES DISTRICT COURT

7                            DISTRICT OF NEVADA

8                                    * * *
                                          )
9    UNITED STATES OF AMERICA,            )
                                          )
10                      Plaintiff,        )            3:09-CV-00314-LRH-RAM
                                          )
11   v.                                   )
                                          )            ORDER
12   THE STATE OF NEVADA, and THE         )
     OFFICE OF THE STATE CONTROLLER,      )
13                                        )
                        Defendants.       )
14   _____ )

15          Before the court are three cross-motions for full or partial summary judgment: first, the

16   State of Nevada's ("the State") Motion for Summary Judgment (#78), along with the United States'

17   opposition (#92) and the State's reply (#97); second, the Office of the State Controller's ("the

18   Controller") Motion for Summary Judgment (#82), along with the United States' opposition (#91)

19   and the Controller's reply (#96); and third, the United States' Motion for Partial Summary

20   Judgment (#83), along with oppositions by the State (#90) and the Controller (#93) and the United

21   States' replies (#95 and #94).

22   I.     Facts and Procedural History

23          This is a reemployment liability and retaliation action filed by the United States on behalf of

24   Arthur Ingram ("Ingram").  The United States alleges that the State and the Controller willfully

25   violated the Uniformed Services Employment and Reemployment Rights Act ("USERRA") by

26   failing to promptly and properly reemploy Ingram as Chief Deputy Controller when he returned

1  from military service, and by retaliating against Ingram for pursuing a complaint with the

2  Department of Labor ("DOL") when they withdrew an offer to reemploy Ingram as Chief

3  Accountant and terminated his employment.

4      On February 17, 2003, Ingram began working as the Chief Deputy for then-Controller

5  Kathy Augustine ("Augustine").  Shortly thereafter, the Department of the Army ordered Ingram to

6  report for active duty on March 23, 2003.  Ingram promptly informed Augustine that he had been

7  ordered to active duty.  The Army later amended Ingram's orders to permit him to report for active

8  duty on June 1, 2003, which he did.

9      When Ingram left for active duty, Augustine selected then-Chief Accountant Kimberly

10  Huys ("Huys") as "Acting Chief Deputy."  When Huys later left the Office of the Controller,

11  Augustine selected Carl W. Reinhard, Jr. ("Reinhard") as Acting Chief Deputy.  Augustine hired

12  Mark Taylor ("Taylor") as Assistant Controller in September 2005.  Following Augustine's death

13  in July 2006, Steve Martin ("Martin") was appointed to complete Augustine's term as Controller.

14  Martin retained Reinhard as Acting Chief Deputy and Taylor as Assistant Controller.

15      Kim Wallin ("Wallin") was elected Controller in November 2006 and took office on

16  January 1, 2007.  Wallin retained three unclassified employees–Acting Chief Deputy Reinhard,

17  Assistant Controller Taylor, and Executive Assistant Michelle Ene ("Ene").  When Reinhard

18  voluntarily left in April 2007, Wallin promoted then-Chief Accountant Karen Hoppe ("Hoppe") to

19  the Acting Chief Deputy position "due to Chief Deputy Controller on military leave."

20      Augustine approved paying Ingram for 15 days of military leave annually in 2004, 2005,

21  and 2006.  Wallin also approved paying Ingram for 15 days of military leave annually in 2007 and

22  2008.  Throughout his military deployment, Ingram submitted leave and earnings statements to

23  Defendants.  Around April 2007, Ingram telephoned Wallin to tell her that he would be on active

24  duty until 2008.  Wallin gave no indication that Ingram would not be reemployed when he returned.

25      Except for one week in April 2006, Ingram served continuously on active duty from June 1,

26  2003 until April 25, 2008, when he was honorably discharged from the Army.  On May 12, 2008,

2

1   Ingram contacted Wallin's Executive Assistant to set up a meeting with Wallin to discuss

2   reemployment.  On June 4, 2008, Ingram met with Wallin, Taylor, and Deputy Attorney General

3   Doug Walther ("Walther") to discuss Ingram's reemployment.  Wallin did not reemploy Ingram at

4   the June 4, 2008 meeting, indicating that she needed to research her rights under USERRA.

5         Also during the June 4, 2008 meeting, Ingram asked Walther if the State of Nevada had a

6   position for him.  Walther informed Ingram that he was there as legal representation for the

7   Controller and that the State Personnel Department had a website that Ingram could use to see if

8   there were other vacant positions for him within the State.  It is undisputed that Ingram never

9   contacted the State Personnel Department to apply for reemployment.

10        On June 17, 2008, Ingram sent Wallin a letter expressing his desire to return to work as

11  Chief Deputy and his intent to start on July 24, 2008.  That same day, Wallin also sent Ingram a

12  letter offering him the position of Chief Accountant in the Office of the Controller.  The offer was

13  subject to the conditions that Ingram submit documentation proving his entitlement to

14  reemployment under USERRA and demonstrate that he meets the minimum qualifications for the

15  position, including passing a required examination.  Taylor was asked to prepare office space for

16  Ingram in case he accepted the position.  On June 25, 2008, Ingram filed a complaint under

17  USERRA with the Department of Labor's Veterans' Employment Training Service ("VETS").

18  Having received Ingram's letter and assuming their letters of June 17 had crossed in the mail, on

19  June 26, 2008, Wallin sent Ingram a second letter reiterating the offer of the Chief Accountant

20  position and explaining her decision not to reemploy him as the Chief Deputy.  On July 1, 2008,

21  VETS informed Wallin of Ingram's USERRA complaint.  On July 8, 2008, Wallin sent VETS a

22  letter disputing Ingram's right to reemployment as Chief Deputy but indicating her willingness to

23  employ him as Chief Accountant according to the terms of her offer letter.

24        On July 24, 2008, Ingram reported for work at the Office of the Controller.  In a meeting

25  with Wallin, Taylor, and Walther, Ingram indicated that he "would accept any position that [they]

26  were willing to give [him], but [he] was going to pursue [his] rights under USERRA" because he

3

1  believed that he was entitled to the Chief Deputy position.  Wallin believed that Ingram "was not

2  going to be satisfied in the Chief Accountant position and, because of his complaint that he filed,

3  that it was a no-win situation."  Nevada officials did not reemploy Ingram in any position.  The

4  same day, Walther sent a letter to VETS explaining that they "informed [Ingram] that since he had

5  filed a complaint with [VETS] that was still under investigation, and that questions regarding

6  [USERRA's] applicability to his situation were unresolved, the Controller was not prepared to have

7  him start work."  Walther further recounted that "Mr. Ingram clarified that he was reporting to

8  work for whatever position the Controller was offering him," and "[t]he Controller clarified to Mr.

9  Ingram that her offer for the Chief Accountant position was based on the assumption that

10  [USERRA] applied and that if it was determined that the Act did not apply, or the Controller

11  decided to exercise her rights for further review of that issue, the offer would be withdrawn."  On

12  December 15, 2008, Wallin sent a letter to Ingram indicating that his employment was terminated

13  effective January 1, 2007, as his "position terminated when Kathy Augustine's term ended."

14  **II.    Summary Judgment Standard**

15      Summary judgment is appropriate only when the pleadings, depositions, answers to

16  interrogatories, affidavits or declarations, stipulations, admissions, answers to interrogatories, and

17  other materials in the record show that "there is no genuine issue as to any material fact and the

18  movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In assessing a motion for

19  summary judgment, the evidence, together with all inferences that can reasonably be drawn

20  therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita*

21  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora*

22  *Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

23      The moving party bears the initial burden of informing the court of the basis for its motion,

24  along with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v.*

25  *Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the

26  moving party must make a showing that is "sufficient for the court to hold that no reasonable trier

4

1    of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259

2    (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

3    To successfully rebut a motion for summary judgment, the non-moving party must point to

4    facts supported by the record which demonstrate a genuine issue of material fact. *Reese v.*

5    *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might

6    affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

7    242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary

8    judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute

9    regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could

10   return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a

11   scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute;

12   there must be evidence on which a jury could reasonably find for the party. *Id.* at 252.

13   **III.    Discussion**

14   Congress enacted USERRA "to encourage noncareer service in the uniformed services by

15   eliminating or minimizing the disadvantages to civilian careers and employment"; to minimize

16   disruptions to the service members and their employers, fellow employees and communities by

17   providing for their prompt reemployment; and to prohibit discrimination against service members

18   because of their service. 38 U.S.C. § 4301(a). In evaluating whether reemployment is appropriate,

19   courts liberally construe USERRA's protections in favor of the returning service member. *Leib v.*

20   *Georgia-Pacific Corp.*, 925 F.2d 240, 245 (8th Cir. 1991).

21   **A.  Standing**

22   Although an individual may bring a USERRA action against a state as an employer in state

23   court, federal jurisdiction over such an action exists only if the action is "commenced by the United

24   States." 38 U.S.C. § 4323(b)(1). In such cases, "the Attorney General may appear on behalf of,

25   and act as attorney for, the person on whose behalf the complaint is submitted" and shall bring the

26   action "in the name of the United States as the plaintiff." *Id.* § 4312(a)(1).

1    In accordance with these provisions, this action was commenced in the name of the United

2    States.  Nonetheless, the Controller asserts the United States lacks standing because it has failed to

3    make itself a party for all purposes by refusing to respond to discovery requests seeking

4    information, documents and witnesses from its various departments (e.g., the Department of

5    Defense).  Citing various cases for the proposition that where the United States is a party it must

6    respond to requests for discovery on behalf of all its departments, the Controller reasons that if the

7    United States refuses to comply with such discovery obligations, then it is not truly the plaintiff.

8    The court disagrees.  What the Controller presents as a standing issue is really a discovery

9    dispute.  If the Controller were correct regarding the United States' discovery obligations, then it

10   might have obtained an order compelling compliance, enforceable by sanctions including possible

11   dismissal of the action.  But whether the United States has standing to sue in the first place is a

12   separate issue.  Moreover, the Magistrate Judge apparently resolved the parties' discovery dispute

13   in favor of the United States, undermining the very premise of the Controller's standing argument

14   that the United States has failed to comply with its discovery obligations.  The Controller did not

15   seek review of that discovery ruling and may not now repurpose its discovery arguments into a

16   challenge to its opponent's standing.  The Controller's motion shall therefore be denied as to the

17   United States' standing.

18   **B.  State of Nevada as an Employer**

19   Only a returning service member's employer is a proper defendant in a USERRA action.

20   *See* 38 U.S.C. § 4323.  The State contends that it is not a proper party to this litigation because it

21   was never Ingram's employer as defined by USERRA.  The court disagrees.

22   The term "employer" is broadly defined as "any person, institution, organization, or other

23   entity that pays salary or wages for work performed or has control over employment opportunities"

24   and specifically includes "[a] State."  *Id.* § 4303(4)(A)(iii).  The term "State" means "each of the

25   several States of the United States . . . (including the agencies and political subdivisions thereof)."

26   *Id.* § 4303(14).  USERRA's definition of employer also allows for the possibility that an employee

6

1   may have more than one employer.  *See* 20 C.F.R. § 1002.37.  Thus, the "employer" of a state

2   employee is not limited to the particular department in which the person is employed.  And the

3   Controller's concession that it qualifies as Ingram's employer does not preclude the State from also

4   qualifying as Ingram's employer for purposes of USERRA.  *Cf. Brandsasse v. City of Suffolk*, 72 F.

5   Supp. 2d 608, 618 (E.D. Va. 1999) ("[T]he broad language of Section 4303(4) includes both the

6   City and . . . Director of Personnel.  The City is an entity that pays salaries or wages for work

7   performed and controls employment opportunities through its agents.").

8         The State argues that it was the Controller alone who had the authority to control the

9   employment opportunities and determine the salary of the Chief Deputy, and Ingram's salary was

10  paid out of the Controller's budget.  Nonetheless, Ingram was quintessentially an employee of the

11  State, both in ordinary parlance and under the provisions of USERRA.  Ingram's salary was funded

12  from the State's general fund, and the State processed his paychecks in its capacity as the ultimate

13  payor, not as an independent payroll processor delegated a purely ministerial function.  *Cf.* 20

14  C.F.R. § 1002.5(d)(1)(i).  Furthermore, the State's attempt to place control in the hands of the

15  Controller misses the point that the State acts through its designated agents.  In this case, the State's

16  designated agent is the Controller, a state constitutional officer whom the State has vested with the

17  statutory authority to act in employment matters concerning her department and who exercises that

18  authority on behalf of the State.  Apart from the State, the Controller has no authority to hire

19  employees and pay salaries whatsoever.  Accordingly, the court concludes that the State qualifies as

20  Ingram's employer under USERRA.  The State's motion shall therefore be denied and the United

21  States' motion shall be granted on this issue.

22        **C.  Eligibility for Reemployment**

23        "[A]ny person who is absent from a position of employment by reason of service in the

24  uniformed services shall be entitled to the reemployment rights and benefits" of USERRA if:

25  (1) the employee has given advance notice of his uniformed service to his employer prior to

26  deployment; (2) the absence does not exceed five years; and (3) the employee applies for

7

1  reemployment within the applicable time frame—here, 90 days.  *See* 38 U.S.C. § 4312(a)(1)-(3),

2  (e)(1)(D).  The plaintiff bears the burden of proving that "he has satisfied USERRA's statutory

3  requirements and is entitled to receive the benefit of reemployment."  *Sutton v. City of Chesapeake*,

4  713 F.Supp.2d 547, 550 (E.D.Va. 2010) (citing *Shadle v. Superwood Corp.*, 858 F.2d 437, 439 (8th

5  Cir. 1988).  The United States moves for partial summary judgment on Ingram's eligibility for

6  reemployment under § 4312(a).  Defendants oppose the motion, arguing that Ingram has failed to

7  satisfy these threshold requirements and that Ingram is also ineligible because his service was not

8  "noncareer."

9           **1.      Five Year Absence**

10          A service member is entitled to reemployment rights under USERRA only if "the

11  cumulative length of the absence and of all previous absences from a position of employment with

12  that employer by reason of service in the uniformed services does not exceed five years."  *Id.*

13  § 4312(a)(2); *see also id.* § 4312(c).  "The five-year period includes only the time the employee

14  spends actually performing service in the uniformed services.  A period of absence from

15  employment before or after performing service in the uniformed services does not count against the

16  five-year limit."  20 C.F.R. § 1002.100.  Thus, the time required to report back to work or apply for

17  reemployment is excluded from the five-year time limit under section 4312(a)(2).  *Id.*  That period

18  is separately governed by subsections (a)(3) and (e) and varies depending on length of service.

19  Here, because Ingram's military service exceeded 180 days, the grace period to apply for

20  reemployment was 90 days.  *Id.* § 4312(e)(1)(D).

21          The undisputed facts demonstrate that Ingram left the Controller's office in preparation for

22  active duty on May 17, 2003, he began his military service on June 1, 2003, and he served

23  continuously on active duty, with the exception of one week in April 2006, until he was honorably

24  discharged on April 25, 2008.  Also, Ingram applied for reemployment no later than June 4, 2008,

25  well within the 90-day grace period allowed under USERRA for employees whose military service

26  exceeds 180 days.  Thus, while Ingram's total absence from the Controller's Office exceeded five

1   years, the time spent actually performing uniformed service did not.  The court therefore concludes

2   that Ingram has satisfied the five-year eligibility requirement.

3       **2.      "Noncareer" Service**

4       As previously noted, one of USERRA's express purposes is "to encourage *noncareer*

5   service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers

6   and employment which can result from such service."  38 U.S.C. § 4301(a)(1) (emphasis added).

7   Defendants assert that Ingram is ineligible for or waived his reemployment rights under USERRA

8   because he voluntarily extended his military service and abandoned his civilian career to become a

9   "career" service member.  The court disagrees.

10      The reference to "noncareer" military service in section 4301 is merely part of a statement

11  of purpose.  Section 4312(a) expressly governs whether a returning service member is "entitled to

12  the reemployment rights and benefits and other employment benefits" of USERRA and contains no

13  requirement that a service member be "noncareer" to be entitled to protection—at least not in those

14  terms.  *Id.* § 4312(a).  Section 4312(a) achieves the stated purpose of section 4301 by imposing a

15  time limitation: a service member's reemployment rights expire after five years of absence from

16  employment due to uniformed service.  *See id.* § 3412(a)(2), (c).  And the court has already found

17  that Ingram complied with that limitation.

18      The fact that Ingram extended his absence by volunteering for service beyond his initial

19  deployment is immaterial.  "In any determination of a person's entitlement to protection under

20  [USERRA], the timing, frequency, and duration of the person's training or service, or the nature of

21  such training or service (including *voluntary service*) in the uniformed services, shall not be a basis

22  for denying protection . . . if the service does not exceed the [five-year] limitations set forth in

23  subsection (c) . . . ."  *Id.* § 4312(h) (emphasis added).

24      The undisputed facts establish that Ingram complied with the express provisions of § 4312

25  regarding the duration and nature of his service, and there is no evidence that he clearly and

26  unequivocally waived any rights to reemployment.  *Cf. Paisley v. City of Minneapolis*, 79 F.3d 722,

9

724 (8th Cir. 1996).  To the contrary, Ingram maintained contact with the Controller throughout his service in the military.  He actively submitted leave and attendance statements to the Controller and was paid annually by Defendants for military leave.  And he actively sought reemployment in his civilian career after his discharge.  The court therefore rejects Defendants' contention that Ingram is ineligible for or waived his reemployment rights under USERRA as a "career" service member.

### 3.    Notice of Service and Application for Reemployment

For Ingram to be eligible for reemployment under USERRA, section 4312 further provides that he must have given advance written or verbal notice of his uniformed service to his employer prior to deployment, and upon returning he must have submitted an application for reemployment to his pre-service employer within 90 days of completing his service.  38 U.S.C. § 4312(a)(1), (a)(3), (e)(1)(D); *see also* 20 C.F.R. §§ 1002.85, 1002.115.  It is undisputed that Ingram satisfied these requirements with respect to the Controller, as Ingram gave advance notice of his deployment to Augustine, and upon returning he timely requested reemployment with Wallin.  The State contends, however, that Ingram satisfied neither requirement as to it because Ingram gave advance notice only to the Controller's Office and did not submit an application for reemployment to anyone with employment authority outside the Controller's Office.

USERRA is intended to minimize disruptions not only to the lives of service members, but also "to their employers."  38 U.S.C. § 4301(a)(2).  Accordingly, where "an employee is employed by more than one employer, the employee . . . must notify each employer that the employee intends to leave the employment position to perform service in the uniformed services."  20 C.F.R. § 1002.85.  The purpose served by such a multiple notice requirement is evident in the hypothetical situation contemplated by the regulations, wherein the service member's two employers are distinct companies, such that notice to one cannot be imputed to the other.  *See id.* § 1002.37.  In this case, however, the Controller and the State are not separate entities.  As already discussed, the Controller is a state constitutional officer and is the State's designated agent in employment matters concerning the Controller's Office.  The court perceives no purpose that would be served in this

case by requiring separate notice of his deployment to both the Controller and the State.  The court therefore concludes that Ingram's advance notice to the Controller as his immediate employer qualifies as notice to the State of his impending deployment.

A similar analysis applies to Ingram's application for reemployment, but only insofar as reemployment in the Controller's Office is concerned.  An application for reemployment "must be submitted to the pre-service employer or to an agent or representative of the employer who has the apparent responsibility for receiving employment applications."  20 C.F.R. § 1002.119.  Here, it is undisputed that Ingram submitted an application for reemployment to the Controller for a position within that department.  Given that Ingram was an employee of both the Controller and the State, and the State vests the Controller with authority over employment matters within that department, the Controller's receipt of Ingram's application for reemployment is imputed to the State insofar as he sought a position within the Controller's Office.

Reemployment outside that department is another matter, however.  "An application for reemployment need not follow any particular format" and may be either written or oral.  20 C.F.R. § 1002.118.  Nonetheless, it requires "more than a mere inquiry" and must comport with the "'reasonable expectations of both the former employee and employer, in light of all the circumstances."  *McGuire v. United Parcel Serv.*, 152 F.3d 673, 676-77 (7th Cir. 1998) (internal quotations and citations omitted).  A proper application for reemployment must therefore be submitted to those with apparent authority over employment matters in order to give the employer a fair opportunity to comply with any reemployment obligations imposed by USERRA.  *See* 20 C.F.R. § 1002.119.  Here, the undisputed facts establish that Ingram failed to submit an application to anyone with apparent responsibility for receiving employment applications for positions outside the Controller's Office.  The three officials with notice of Ingram's desire for reemployment (Controller Wallin, Assistant Controller Taylor, and Deputy Attorney General Walther) all lacked such apparent authority, and his mere inquiry to Walther regarding reemployment with the State did not comport with the parties' reasonable expectations.  Wallin and Taylor's authority was plainly

limited to the Controller's Office.  And Walther was acting as legal counsel for the Controller and specifically directed Ingram to the appropriate department, the Nevada Department of Personnel. As it is undisputed that Ingram failed to contact anyone with apparent authority regarding reemployment opportunities in other State agencies or departments, the court concludes that Ingram properly applied for reemployment only within the Controller's Office.

Ingram's failure to properly apply for reemployment outside the Controller's Office renders him ineligible for reemployment rights and benefits in any other State agency or department.  The State is therefore entitled to partial summary judgment to that extent.  The court also concludes, however, that Ingram gave proper advance notice of his deployment to both Defendants and that his application for reemployment was effective as to both Defendants regarding reemployment within the Controller's Office.  Consequently, the State's potential liability for any violation of Ingram's entitlement to reemployment is coextensive with that of the Controller.[1]

**D. Affirmative Defenses**

In addition to setting forth the requirements for a returning service member's eligibility for reemployment rights, section 4312 also sets forth three affirmative defenses.  Subsection (d)(1) provides:

> An employer is not required to reemploy a person under this chapter if--
>
> (A) the employer's circumstances have so changed as to make such reemployment impossible or unreasonable;
>
> (B) in the case of a person entitled to reemployment under subsection (a)(3), (a)(4), or (b)(2)(B) of section 4313, such employment would impose an undue hardship on the employer; or
>
> (C) the employment from which the person leaves to serve in the uniformed services is for a brief, nonrecurrent period and there is no reasonable expectation that such employment will continue indefinitely or for a significant period.

---

[1]As neither party has briefed the issue, the court makes no determination as to the propriety of the United States' practice of naming both the State and the Controller as separately named defendants where their potential liability is coextensive.  Insofar as Defendants argue that some distinction must be drawn between the State and the Controller given that they have been sued separately, the court disagrees that pleading practice is determinative of USERRA's application.

38 U.S.C. § 4312(d)(1).  The employer has the burden of proving each defense.  *Id.* § 4312(d)(2).

Furthermore, because USERRA's protections are to be construed broadly in favor of the returning

service member, *see Leib*, 925 F.2d at 245, the affirmative defenses must be construed narrowly

against an employer seeking to avoid USERRA liability.

Summary judgment is requested by the United States on all three defenses and by the

Controller on the first and third defenses.  Because Defendants bear the burden of proof, to defeat

the United States' motion they must establish a genuine dispute of material fact on each essential

element of each defense.  *See Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 825 (9th

Cir. 2011).  Conversely, to be entitled to summary judgment, the Controller "must not only prove

each element of the affirmative defense, but . . . must also show that no genuine issues exist with

respect to any element of the defense."  *United States v. Ala. Dep't of Mental Health & Mental

Retardation*, 2010 WL 454905, *7 (M.D. Ala. Feb. 10, 2010).

### 1.    Changed Circumstances

Ingram is not entitled to reemployment in the Controller's Office if Defendants establish

that the Controller's "circumstances have so changed as to make such reemployment impossible or

unreasonable."  38 U.S.C. § 4312(d)(1)(A).  This section "creates an affirmative defense for

employers so that § 4312(a) cannot act as an absolute guarantee of reemployment, counter-

balancing the protection of military service-men and women with the reality of changing business

needs and employee/employer relationships that would make reemployment unreasonable."  *Hays

v. Commc'n Techs., Inc.*, 753 F. Supp. 2d 891, 899 (S.D. Iowa 2010).  "The purpose of the

exemption is to allow employers who have eliminated a reservist's position or otherwise drastically

changed their business to avoid rehiring someone for a job that no longer exists."  *Cole v. Swint*,

961 F.2d 58, 60 (5th Cir. 1992).  The exemption may apply, for example, "where there has been an

intervening reduction in force that would have included the employee," 20 C.F.R. § 1002.139(a), or

where the employee has engaged in conduct while on military leave "that would be cause for

dismissal at any other time."  *Hays*, 753 F. Supp. 2d at 899.  "The employer may not, however,

1    refuse to reemploy the employee on the basis that another employee was hired to fill the

2    reemployment position during the employee's absence, even if reemployment might require the

3    termination of that replacement employee."  20 C.F.R. § 1002.139(a).

4        Here, there has been no reduction in force or any misconduct by Ingram during his military

5    leave that would make his reemployment impossible or unreasonable.  Nonetheless, Defendants

6    contend that Wallin's interim election as Controller, along with Wallin's different political party

7    affiliation and expectations of a Chief Deputy in light of her unique skills and experience,

8    constitutes a change in circumstances making it unreasonable to reemploy Ingram as Chief Deputy.[2]

9        The court declines to adopt a per se rule that the mere election of a new public official

10   constitutes a change in circumstances making reemployment of a staff member impossible or

11   unreasonable.  USERRA's text is not amendable to such an interpretation.  The definition of

12   covered employers expressly includes "any successor in interest to a person, institution,

13   organization, or other entity" that qualifies as an employer.  38 U.S.C. § 4303(4)(A)(iv).  Also,

14   USERRA expressly includes "a State" as a covered employer but includes no exception for elected

15   officials.  *Id.* § 4303(4)(A)(iii).  Thus, the defense does not apply merely because another individual

16   has filled the service member's boss's job—even if the boss is an elected official.[3]

17       The court also declines to hold, however, that the election of a new public official could

18   never constitute a change in circumstances making reemployment impossible or unreasonable for

19   purposes of the exception.  The changed circumstances exemption is, after all, intended to address

20   those situations where the change in circumstances would have led to the employee's termination

21

22   [2]Defendants' argument that applying USERRA in this case would violate the Tenth
23   Amendment by infringing on a state elected official's appointment powers is addressed separately in
     Part E *infra*.

24   [3]Not all successors in interest are necessarily subject to USERRA's requirements.  A multi-
25   factor test applies in determining whether an entity qualifies as an "employer" as a "successor in
     interest" to the returning service member's former employer.  *See* 38 U.S.C. § 4303(4)(D).  The
26   Controller's Office makes no argument, however, that it does not qualify as Ingram's employer under
     § 4303 by virtue of any change in the officeholder or otherwise.

even if he had never left for military service.  In the context of public offices, elections can have consequences not only for outgoing officials but also for their staff, depending on the nature of the office and the nature of the positions within that office.

Here, disputed issues of material fact preclude summary judgment as to whether the election of Wallin as State Controller constituted a change in circumstances making it impossible or unreasonable to reemploy Ingram.  Such issues include, but are not necessarily limited to, the extent to which the position of Chief Deputy is politically sensitive and entails responsibilities and duties that implicate important policymaking decisions, and the ramifications of a change in the position of Controller, and Wallin's election in particular, on the staff of the Controller's Office.[4]  Summary judgment is therefore inappropriate, and the motions of the United States and the Controller shall be denied accordingly.

### 2.    Undue Hardship

Under the second exemption, reemployment is not required if, "in the case of a person entitled to reemployment under subsection (a)(3), (a)(4), or (b)(2)(B) of section 4313, such

---

[4]To the extent the Controller argues that the changed circumstances exemption should apply because Wallin considers Ingram unqualified for the position of Chief Deputy, the argument is misplaced.  It is certainly within the Controller's authority, both under state law and USERRA, to determine the essential requirements for her Chief Deputy, with the consequence that Ingram might no longer be qualified for the position following his absence and Wallin's interim election.  *See id.* § 4303(9) (defining "qualified" as "having the ability to perform the essential tasks of the position"); 20 C.F.R. § 1002.198(a)(1) (providing that "[t]he employer's judgment" is relevant in determining the essential tasks of a position).  And USERRA also permits an employer to deny a returning service member his former position if he is no longer qualified.  *See* 38 U.S.C. § 4313(a).

But the right to "reemployment" under USERRA is not limited to the service member's former position.  *See id.*  And the fact that the service member is no longer qualified for reemployment in his former position cannot justify applying the section 4312(d) exemptions to deny any reemployment whatsoever.  Section 4313(a) establishes an "order of priority" for positions of reemployment and expressly accounts for the circumstance that a returning service member is no longer qualified for reemployment in his former position.  Because that section provides that a person who is unqualified for reemployment in his former position under subsection (a)(2) is nonetheless entitled to reemployment in an alternative position under subsection (a)(4), it simply cannot be said that such lack of qualifications makes  reemployment "impossible or unreasonable" for purposes of the changed circumstances exemption.

employment would impose an undue hardship on the employer." 38 U.S.C. § 4312(d)(1)(B). In the case of actions taken by the employer, "undue hardship" means "actions requiring significant difficulty or expense," as considered in light of various factors. *Id.* § 4303(15).

Because Ingram is not disabled, subsections (a)(3) and (b)(2)(B) of section 4313 are inapplicable on these facts, leaving only subsection (a)(4) as a potential predicate. Under subsection (a)(4), Ingram would be entitled to reemployment "in any other position which is the nearest approximation" to his former position if both (A) he "is not qualified to be employed" in his former position as Chief Deputy, "or in a position of like seniority, status and pay," and (B) he "cannot become qualified with reasonable efforts by the employer." *Id.* § 4313(a)(4). Thus, to prevail on the undue hardship defense under section 4312(d)(1)(B), Defendants must establish that (1) Ingram is ineligible for reemployment in his former position of Chief Deputy, or in a position of like seniority, status and pay (if any), under the terms of section 4313(a)(4), and (2) it would impose an undue hardship on the Controller to employ him under section 4313(a)(4) in any other position which is the nearest approximation to the Chief Deputy position.

Although Defendants have presented sufficient evidence raising a genuine dispute of material fact as to the first requirement, they have failed to make any showing as to the second. The Controller expressly concedes that the position of Chief Accountant would "qualif[y] under 4313(a)(4) as the 'nearest approximation' to the Chief Deputy position." Doc. #93, p. 20. It is undisputed that the Controller offered Ingram the Chief Accountant position and in doing so specifically stated that he was qualified for it. And no showing has been made that it would require significant difficulty or expense to employ Ingram in such an alternative position. The Controller's attempt to show that it would impose an undue hardship to reemploy Ingram as Chief Deputy under section 4313(a)(2) is beside the point.

The court rejects the Controller's argument that the Chief Accountant position should not be considered as an available alternative because Ingram waived any interest in the position by rejecting the Controller's offer or by failing to accept it fully and in writing. USERRA requires

only that the employee either report to work or submit an application for reemployment to preserve his rights.  *See* 38 U.S.C. § 4312(a)(3).  The undisputed facts establish that Ingram applied for reemployment, reported to work, and specifically indicated that he would accept any position the Controller was willing to give him, while continuing to pursue his claim to the Chief Deputy position.  It was the Controller who then refused to allow him to begin work based on her own belief that Ingram would not be satisfied with the Chief Accountant position given his insistence on being reemployed as Chief Deputy.  Given Ingram's affirmative conduct, his reservation of rights to pursue greater benefits under USERRA does not constitute a constructive waiver of any right to reemployment as Chief Accountant.  *Cf.* H.R. Rep. No. 103-65, at 39 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2472 (affirming "the decisions in *Stevens v. Tennessee Valley Authority*, 699 F.2d 314, 316 (6th Cir. 1983) and *Hanna v. American Motors Corp.*, 724 F.2d 1300, 1312-1313 (7th Cir. 1984), which hold that a veteran or reservist does not waive his or her rights under the Act by refusing an offer of reemployment which extends anything less than full statutory guarantees, including proper seniority, position, pay and lost wages and benefits").

Moreover, even if there were merit to Defendants' waiver argument, as applied to this second exemption the argument is self-defeating.  Any waiver of rights to reemployment in an alternative position would, of course, limit the scope of Ingram's reemployment claim and his available remedies.  But Defendants' ability to assert this affirmative defense is another matter.  By its own terms, the undue hardship defense applies only insofar as Ingram is "entitled to reemployment under subsection . . . (a)(4) . . . of section 4313" in the nearest approximation to the Chief Deputy position.  If Ingram had waived his right to reemployment in any such alternative position and asserted only a right to reemployment in his former position under section 4313(a)(2), the undue hardship defense would be inapplicable, compelling summary judgment for the United States.

For the foregoing reasons, the court concludes that Defendants have failed to establish the existence of a genuine issue of material fact as to whether reemploying Ingram in accordance with

section 4313(a)(4) would impose an undue hardship on the Controller.  The United States is therefore entitled to partial summary judgment with respect to the second affirmative defense.

### 3.      Brief, Nonrecurrent Employment, and Expectation of Continuation

Finally, reemployment is not required where "the employment from which the person leaves to serve in the uniformed services is for a brief, nonrecurrent period and there is no reasonable expectation that such employment will continue indefinitely or for a significant period."  38 U.S.C. § 4312(d)(1)(C).  Like the changed circumstances exemption, this third exemption is essentially directed at determining whether the service member should not be entitled to reemployment upon his return from service because his employment would have terminated even if he had not left for military service.  But the two exemptions operate quite differently.  The changed circumstances exemption looks to events that occurred during the service member's absence and the state of affairs upon his return to determine, from the employer's perspective, whether reemployment would be impossible or unreasonable.  By contrast, this third exemption focuses on the terms of employment as they were prior to the employee's departure and whether, at that time, he could have reasonably expected his employment to continue indefinitely or for a significant period of time if he were to stay.[5]

---

[5]The court disagrees with the suggestion that this third exemption turns on Ingram's expectation of *reemployment* upon his return from service, as opposed to continued employment had he not left. Such a construction is unsupported by the plain language of the exemption, which places the perspective at the time of "the employment from which the person leaves" (*i.e.*, pre-deployment) and refers to the expectation that "such employment . . . will continue."  No reference is made to the employer's actions during the period of uniformed service or to the person's expectation of "reemployment" upon returning.  *See also* 20 C.F.R. § 1002.149 (providing that an employee's entitlement to certain rights and benefits during an absence for uniformed service "is not dependent on how the employer characterizes the employee's status during [that] period").  The court's interpretation also avoids any circularity in having to determine whether a service member is entitled to reemployment under USERRA's substantive provisions based on the employer's actions and the service member's expectation of reemployment, where such actions and expectations are influenced by those same substantive provisions.

Here, the undisputed facts establish that Ingram was hired on an ongoing, indefinite basis, not as a term employee for a "brief, nonrecurrent period." He was hired at nearly the beginning of then-Controller Augustine's four-year term.[6] There was no express or implied condition placed on Ingram's employment that it would terminate after a certain period of time or at the conclusion of a certain task or project, or even at the conclusion of the Augustine's term or within any period of time after the election or appointment of a new Controller. The fact that Ingram was an at-will employee and could have been terminated at any time is not determinative. In light of the mandate that USERRA's protections be construed broadly and the statute's focus on the temporal nature of the person's employment, as opposed to the grounds for termination, the court declines to adopt a rule that would exempt innumerable non-term or career employees from USERRA's reemployment protections merely because they are "at will" under state law. Because Congress could have easily exempted at-will employees from USERRA's protections had it so intended, the court will not infer such an exemption absent clearer language to that effect.

Nor is it determinative that the Controller is elected for a four-year term and that Augustine was term-limited. Even if the time remaining on Augustine's term could be imputed to Ingram when he was hired, a nearly four-year term can hardly be deemed "brief," particularly when measured against the five-year time limit that USERRA places on reemployment rights. Also, no such imputation is called for here. Custom or political necessity may certainly dictate the replacement of certain personnel in some governmental offices following an election, thereby placing an implied limitation on the term of employment. But there is no evidence on this record of such a practice in the Controller's Office. Quite the contrary, the undisputed facts establish that it was common for the incumbent Chief Deputy to continue in the position despite the appointment or election of a new Controller until the incumbent voluntarily resigned the position, even where their

_____

[6]Given the court's construction of this exemption, it is immaterial that Augustine actually served only until her death in July 2006. Events occurring during Ingram's absence that were unforeseeable prior to his departure are material only to the changed circumstances exemption.

political affiliations differed.  While the new Controller certainly has the discretionary authority to replace the Chief Deputy at any time, the fact remains that there was no express or implied limitation fixing the term of employment.

For substantially similar reasons, the court finds that, prior to his deployment, Ingram could have reasonably expected that his employment would "continue indefinitely or for a significant period."  Once again, it is not determinative that Ingram was an at-will employee and there was no guarantee he would not have been terminated if he stayed.  Ingram need not show that continued employment was guaranteed, or even that it was likely.  Rather, for the exemption to apply, there must have been "no reasonable expectation" that his employment would continue.  Permanent employment is also not required.  The statute sets a much lower bar by requiring only an "indefinite[]" or "significant" period of continued employment.  And it is undisputed that Ingram was hired on an ongoing basis, with nearly four years remaining on Augustine's term and with no express or implied limitations on the term of his employment.

The court therefore concludes that Defendants have failed to establish the existence of a genuine issue of material fact as to the third exemption.  The United States is therefore entitled to partial summary judgment, and the Controller's motion shall be denied accordingly.

**E.  Tenth Amendment**

Defendants renew their contention that applying USERRA to require reemployment of Ingram as Chief Deputy would violate the Tenth Amendment by interfering with the Controller's discretionary appointment powers and the State's right to self-governance.[7]  In a prior order, the court denied Defendants' motion for judgment on the pleadings, stating: "It remains a question of material fact whether the Chief Deputy is an 'important government official' whose operations 'go to the heart of representative government.'  Based on the pleadings alone, it is unclear whether the

---

[7]Insofar as the State argues that compelling the reemployment of Ingram in a position *outside* the Controller's Office would violate the Tenth Amendment, that issue is now moot given the court's ruling limiting Ingram's eligibility for reemployment rights to positions within the Controller's Office.

1   Chief Deputy position entails responsibilities and duties that implicate important policymaking

2   decisions relevant to a state's right to self-government."  Doc. #72, p. 6 (footnote omitted).

3   Although the record before the court now goes beyond the pleadings, viewing the evidence in the

4   light most favorable to the plaintiff, the court finds that the same questions of material fact remain,

5   precluding summary judgment.

6          Moreover, the court declines at this time to decide a novel constitutional question that may

7   not be necessary to the resolution of this case.  It is a "'paramount principle of judicial restraint'"

8   that "courts should interpret statutes in a manner that avoids deciding substantial constitutional

9   questions."  *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1106 (9th Cir. 2001) (quoting *United States v.*

10  *Restrepo*, 946 F.2d 654, 673 (9th Cir. 1991)).  Here, the court is of the opinion that USERRA may

11  fairly be construed so as to avoid Tenth Amendment concerns.  First, pursuant to section 4313, the

12  right to reemployment under USERRA is not limited to the former position of employment.

13  Second, USERRA takes into account the employer's judgment in determining whether the

14  employee is qualified for reemployment in the former position under section 4313(a)(4).  And third,

15  disputed issues of material fact remain as to whether Ingram would be entitled to reemployment

16  only in an alternative position, such as Chief Accountant.[8]  The constitutional issues presented may

17  therefore be avoided in this case by virtue of USERRA's inherent flexibility.

18         The court will therefore deny Defendants' motions for summary judgment without prejudice

19  as to the Tenth Amendment.

20         **F.  Retaliation**

21         An employer "may not discriminate in employment or take any adverse action" against a

22  person for taking any action to enforce USERRA's protections or exercising any USERRA rights.

23  38 U.S.C. § 4311(b).  "An employer shall be considered to have engaged in actions prohibited . . .

24

25         [8]Defendants argue only that reemployment in the position of Chief Deputy would violate the
26  Tenth Amendment.

under subsection (b)" if such person's enforcement action or exercise of rights "is a motivating

factor in the employer's action, unless the employer can prove that the action would have been

taken in the absence of such person's enforcement action . . . or exercise of a right." *Id.*

§ 4311(c)(2).  Under the applicable burden-shifting framework, Ingram first must show by a

preponderance of the evidence that his protected activities were a substantial or motivating factor in

an adverse employment action, after which Defendants may avoid liability only by showing, as an

affirmative defense, that they would have taken the same action anyway absent Ingram's protected

activities. *See Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2006); 20 C.F.R.

§§ 1002.22-.23.

It is undisputed that Ingram engaged in protected conduct by applying for reemployment

under USERRA, by filing a complaint with VETS, and by asserting and reserving his rights to

reemployment as Chief Deputy.  The evidence is also undisputed that Wallin offered Ingram

reemployment in the position of Chief Accountant while taking the position that Ingram was not

entitled to reemployment in the position of Chief Deputy, that Ingram reported for work and

indicated he would accept any position while reserving his right to the Chief Deputy position and

while continuing to pursue his VETS claim, and that Wallin then withdrew the offer of the Chief

Accountant position believing that Ingram would not be satisfied with that position.

This sequence of events and the related correspondence by Wallin and Walther would

support a finding that the Controller made an offer of reemployment in the position of Chief

Accountant and that Ingram's claim to reemployment in his former position was a motivating factor

in the Controller's decision to revoke the offer and deny reemployment in any position.  Defendants

maintain, however, that the offer was an offer of settlement that was made only as a compromise

between Ingram's demand for reemployment as Chief Deputy and the Controller's belief that

Ingram lacked any reemployment rights at all.  It is thus disputed whether Wallin's offer of

reemployment for the position of Chief Accountant was an unconditional offer of employment

based on the belief that Ingram was entitled to at least some form of reemployment under USERRA, or whether it was instead merely an offer of compromise that was motivated only by Ingram's demand for reemployment as Chief Deputy, made despite the Controller's belief that Ingram had no right to reemployment in any position, and contingent upon Ingram's agreement not to pursue his VETS complaint and to waive any right to the Chief Deputy position.

USERRA's retaliation provision should not be read to preclude bona fide attempts to settle genuine disputes over the applicability of USERRA's reemployment protections.  If an employer believes that no reemployment is required by USERRA and makes an offer of reemployment solely to settle a returning service member's claim, the employer's subsequent refusal to reemploy the person based on his rejection of the settlement and continued pursuit of a USERRA claim would not be grounds for a retaliation claim.  In section 4311(c) terms, because the employer would have denied reemployment anyway and made the offer solely to settle the person's disputed claim to even greater benefits, the employer's denial of reemployment following rejection of the settlement offer cannot be attributed to the protected conduct.

At the same time, however, the plain language of section 4311 prohibits an employer from taking any adverse employment action that the employer would not have taken absent the person's protected conduct.  Accordingly, where an employer has made an offer of reemployment not solely as an offer of compromise but at least in part because the employer believes the person is entitled to at least some reemployment benefits under USERRA, it would constitute retaliation for the employer to deny those benefits in response to the person's reservation of rights and pursuit of a claim for greater benefits.

While the scope of section 4311 and its applicability to offers of settlement are questions of law, what kind of offer has been made and the employer's motivations in making it are, of course, questions of fact.  Because genuine factual questions remain, summary judgment on this issue is inappropriate and shall be denied as to all parties.

**G. Damages**

    **1.    Compensatory Damages**

Defendants contend that compensatory damages for lost wages and benefits should be limited to one year.  They point to section 4316(c)(1), which provides that a person who is reemployed under USERRA "shall not be discharged from such employment, except for cause . . . within one year . . . ."  Consequently, if Ingram were reemployed as Chief Deputy, after that one-year period he would revert to an at-will employee subject to discretionary termination by the Controller under state law.  The court disagrees, however, that a one-year cap on compensatory damages necessarily follows.

First, section 4316 does not govern compensatory damages for failing to reemploy a returning service member.  Instead, it addresses "the seniority and other rights and benefits determined by seniority" to which a person "who *is* reemployed" is entitled.  *Id.* § 4316(a) (emphasis added).  Compensatory damages for failing to reemploy a person in violation of section 4312 are instead governed by section 4323(d)(1)(B), which imposes no time limit.  *See also Francis*, 452 F.3d at 304 (construing the protections provided by sections 4312, 4311 and 4316 as "functionally discrete").  Section 4323 also provides for compensatory damages in addition to requiring the employer to comply with any other obligations under USERRA, such as reemployment.  *Id.* § 4323(d)(1)(A)-(B).  Thus, compensatory damages could potentially cover the period prior to court-ordered reemployment, even if that period exceeds one year.

Second, Defendants' argument relies on the uncertain and speculative factual assertion that after one year the Controller would terminate Ingram's employment as Chief Deputy.  Mindful of the prohibition against discriminating in employment or taking any adverse employment action against a person for the exercise of USERRA rights, *see id.* § 4311(b), the court declines to give credence to the Controller's assertion, where Ingram has not yet been reemployed and the Controller's experience with him has been largely limited their dispute over his USERRA rights.

Third, even if such credence could be given, Defendants have once again limited their arguments to Ingram's reemployment as Chief Deputy.  They have failed to account for the possibility that Ingram may have been entitled to reemployment as Chief Accountant, along with appropriate seniority and any applicable protections against termination, which have not been addressed.  *See id.* § 4316(a).

Defendants' motions to cap compensatory damages shall therefore be denied.

### 2.    Liquidated Damages

Section 4323 additionally provides for payment of "an amount equal to the amount [of compensatory damages] in liquidated damages, if the court determines that the employer's failure to comply with the provisions of [USERRA] was willful."  *Id.* § 4323(d)(1)(C).  The Controller alone moves for partial summary judgment to foreclose such damages, arguing that governmental entities are immune from punitive damages awards and that its conduct was not willful.

### (a)  Governmental Immunity

The Controller argues that USERRA's provision for liquidated damages at the rate of two-times compensatory damages based on a willful violation is punitive in nature, *see Maher v. City of Chicago*, 463 F. Supp. 2d 837, 841-42 (N.D. Ill. 2006), and that there is a presumption against the application of punitive damages against governmental entities that arises from the common law, *see Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 785 (2000); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *Stoner v. Santa Clara County Office of Educ.*, 502 F.3d 1116, 1121 (9th Cir. 2007).  But that presumption is rebuttable.  It consists of an "assumption" that Congress is "familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, *absent specific provisions to the contrary*."  *City of Newport*, 453 U.S. at 259 (emphasis added); *accord id.* at 263 ("[W]e proceed on the familiar assumption that 'Congress would have specifically so provided had it wished to abolish the doctrine.'") (citation omitted).

25

In USERRA cases the presumption is rebutted.  In addition to providing for liquidated damages, section 4323(d) specifically states: "A State shall be subject to the same remedies, including prejudgment interest, as may be imposed upon any private employer under this section." 38 U.S.C. § 4323(d)(3).  The common law rule against imposing punitive damages against governmental entities is therefore inapplicable.

### (b) Willful Conduct

USERRA itself does not define willfulness.  Borrowing the definition from other contexts, however, a violation of USERRA is willful if "'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 615 (1993) (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 133 (1985)), *adopted in* H.R. Rep. No. 103-65, at 38 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2471.  An intent to violate the statute is not necessary; but it is also not sufficient that the employer simply knew of its potential applicability.  *Thurston*, 469 U.S. at 126-28 & n.19.  Plaintiff has the burden of proving willfulness, which may be shown by circumstantial evidence.  *Paxton v. City of Montebello*, 712 F. Supp. 2d 1017, 1021 (C.D. Cal. 2010).

Here, disputed issues of material fact remain as to the Controller's knowledge, intentions and motivations in making and withdrawing the offer of reemployment for the position of Chief Accountant.  The Controller's motion will therefore be denied without prejudice as to liquidated damages based on a willful violation of USERRA.

### IV.   Conclusion

In summary, the court concludes that (A) the United States has standing to sue; (B) the State of Nevada is subject to suit as Ingram's employer; (C) Ingram is eligible for reemployment rights and benefits under section 4312(a), but only as to positions within the Controller's Office; (D) questions of material fact remain as to applicability of the changed circumstances defense under section 4312(d), but the second and third affirmative defenses are inapplicable; (E) questions

of material fact remain as to whether application of USERRA in this case would violate the Tenth Amendment, and in any event the doctrine of constitutional avoidance counsels against resolving such a novel issue at this time; (F) questions of material fact remain as to retaliation; and (G) compensatory damages are not limited to one year, and questions of material fact remain as to liquidated damages.

IT IS THEREFORE ORDERED that the State of Nevada's Motion for Summary Judgment (#78) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that the Office of the State Controller's Motion for Summary Judgment (#82) is DENIED.

IT IS FURTHER ORDERED that the United States' Motion for Partial Summary Judgment (#83) is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

DATED this 23rd day of September, 2011.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE